FREDERICK SCHUEPBACH, Appellant, v. LA-CLEDE GAS LIGHT COMPANY.

**Division One, February 28, 1911.**

1. **APPEAL: Erroneous Instruction: Correct Verdict.** If the trial court gave an erroneous instruction for defendant, and in spite of it a verdict was returned for him, and that verdict is right under the law, the court will not, on plaintiff's appeal, reverse the judgment and remand the cause because of error in the instruction. The Legislature has the right to enact the statute declaring that a verdict is not to be reversed, unless error materially affecting the merits was committed; and the merits, when plaintiff has no cause of action, relate solely to the judgment, and if it is right the appellate court should not set it aside because of erroneous instructions given.

2. **NEGLIGENCE: Accident: Falling Through Trap Door.** Both plaintiff and defendant's servant were where they had a lawful right to be. The servant had gone to the basement to inspect a gas meter, and having finished his work came up the stairway, at the head of which was a trap door, and at the same time plaintiff was using a public telephone there, and almost immediately after the door was raised, the plaintiff, who did not know there was such a door there stepped back, and fell through to the basement floor and was injured. Defendant's servant did not know of the presence of the telephone or of plaintiff, and neither saw the other. *Held,* the servant was not negligent while about his master's business, and hence the master is not liable.

3. ———: **Instruction: Failure to Look.** Failure to use ordinary care to discover plaintiff's peril is sometimes negligence; but an instruction so declaring ought not to be given where there is no evidence upon which to base it.

Appeal from St. Louis City Circuit Court.—*Hon. Jas. E. Withrow,* Judge.

AFFIRMED.

*John A. Talty* for appellant.

Appellant was lawfully upon the premises in question. It was a public place, into which he had been invited by the proprietor for his benefit and for the purposes carried on therein. The respondent's servant opened the trapdoor and left it open. He caused the existence of this pitfall, and stated in his testimony, without objection being made, that he knew that this trapdoor open was a matter of imminent peril to persons in and about the premises. He knew the natural and probable consequences of his act in opening the trapdoor and allowing it to remain open. "The liability of a person charged with negligence does not depend upon the question whether, with the exercise of reasonable prudence, he could or ought to have foreseen the injury complained of, but he may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission." Fishburn v. Railroad, 127 Ia. 492; Dean v. Railroad, 199 Mo. 411. Therefore, to say the least, it was not only his duty to warn appellant or close the trapdoor after he saw him in a position of danger, but it was his duty to use ordinary care to see and ascertain whether appellant was in a position of danger. Actual knowledge of danger is not necessary; proof of facts from which knowledge may be implied is suffi-

cient, negligently remaining ignorant being an equivalent to actual knowledge.  Actual notice is not necessary where the danger could have been discovered by the exercise of due care, in this case ordinary care. 6 Thompson, Neg. 7529 and vol. 1, 294; Guenther v. Railroad, 108 Mo. 18; Phillips v. Railroad, 211 Mo. 419; Dahlstrom v. Railroad, 96 Mo. 99; Fassbinder v. Railroad, 126 Mo. App. 570; Heberling v. Warrensburg, 204 Mo. 604; Loehringer v. Construction Co., 118 Mo. App. 163; 29 Cyc. 431.


*Percy Werner* for respondent.

Under the facts the case should never have been permitted to go to the jury, and it is therefore immaterial whether the instructions given in behalf of the defendant were erroneous.  Chandler v. Gas Company, 174 Mo. 328; State ex rel. v. Elliot, 157 Mo. 618.  Respondent insists that the instructions given for defendant were correct expositions of the law.  If the plaintiff, as a licensee of the owner of that dramshop, as between him and such owner, took things as he found them and used the telephone at his own risk (and such is undoubtedly the law; see Kelly v. Benas, 217 Mo. 9), then, certainly, the employee of the defendant, who was there attending to the business of his employer, and who had no connection with the dramshop, owed no duty to the plaintiff except that of not injuring him after he knew that he was in a place of danger. And this is what the jury was told in the instruction which plaintiff's counsel criticizes.  Phillips v. Railroad, 211 Mo. 419; Loehring v. Construction Co., 118 Mo. App. 173; Reynolds v. Van Beuren, 155 N. Y. 120.


LAMM, J.—Plaintiff, counting on negligence, sues in the circuit court of the city of St. Louis, for $15,000 damages for personal injuries.  A verdict going against him and judgment following, he appeals—

complaining of one of defendant's instructions. It is argued, *contra*: (1) That the criticised instruction is good law. (2) Further, that the judgment should stand though the instruction be bad—this on the theory that plaintiff made no case for the jury on the evidence; *ergo,* if the verdict had been for him, it would have had no legal foot to stand on and (the result being right) a mere error in instructions does not go to the merits.

The story of the case may be outlined by fetching a small compass. Thus:

**The case on the pleadings.**

The petition runs on the theory that plaintiff was lawfully in a certain building using a telephone; that a certain one of defendant's servants in the line of his service, while plaintiff was telephoning, opened a trapdoor in the floor in plaintiff's rear and negligently left it open, without plaintiff's knowledge and without giving him any warning or notice; and that plaintiff, unaware of his danger, in leaving the telephone, stepped into the opening in the floor thus made, fell into the basement and suffered grave injuries.

The answer, barring conventional admissions, denies the charging allegations and pleads contributory negligence, in that plaintiff without exercising ordinary care stepped backwards into the hole without looking to see whether the trapdoor was up or down.

The reply denies the contributory negligence.

**The case on the facts.**

Defendant stood mute at the trial—plaintiff having fully exploited the mine of facts by putting on the stand all the known eye-witnesses, including defendant's servant, whose alleged negligence is complained of. There is little conflict between plaintiff's witnesses, and what little there is will presently appear. On June 2, 1906, there was a dramshop on the ground floor at the northwest corner of Jefferson and Chippewa streets in St. Louis, run by one Labenberger.

In the basement were gas meters belonging to defendant, used in its business in measuring gas distributed to customers. One Burke was in defendant's employ as an inspector of gas meters, and on that day in his line of duty went into the basement to inspect meters, in the usual way and with the consent· of the manager of the dramshop. To get to this basement one had to open a trapdoor in the floor and descend a stairway there. Burke had never been on the premises before, and on this day, armed with a memorandum book and an electric searchlight, went into the dramshop, opened the trapdoor, went down the stairway, pulling the trapdoor to, and went about his inspecting work for ten or fifteen minutes. The size of Labenberger's barroom is dark. On its north side, extending to within about four feet of the west side, was a piece of wall furniture know as a "bar fixture." Its use is not disclosed by the record and a judicial guess in that behalf (by a Missouri court) ought to be worthless. In front of this fixture and running parallel therewith, about three feet away, extended a counter, presumably some sort of a convenience .for bibulous ends. The barkeeper plied his trade between the counter and the fixture, his liquor within reach—the general public having business, if any, before and not behind this counter. To the west of the wall fixture, also against the north wall, was an icebox. Hard by the icebox was a door leading to a toilet room and barber shop used by the patrons of the dramshop and others. Either this door or another close-by door led into a lunch room. Whether the lunch room was an appendage or independent of the barroom, we do not know, but, at any rate, the door was used to enter the lunch room from the dramshop. The arrangement outlined was such that a small part of the barroom in the northwest corner is called a "passage-way," say, four feet wide, for use in going to the toilet, to the barber shop or to the lunch room. This passage-way was not partitioned or

walled off, but was bounded on the west by the west wall of the room and on the east partly by the icebox, the end of the bar fixture and end of the counter. On the south it opened into the lobby of the dramshop and either on the north or west of the passage-way was said door or doors. The trapdoor was six or seven feet long, about three feet wide and extended about twenty inches into this passage-way, running east between the bar fixture and counter for four or five feet, covering the whole of that space. The trapdoor opened from north to south. There was a sign in front of the dramshop indicating that a "pay telephone" was inside. Repairs in the barroom and the putting in of a new icebox caused the telephone to be taken from the wall. At the time in hand it was screwed to a board and this board was either reclining against the wall in the passage-way or was on a common chair close by the icebox. There is not a particle of evidence that Burke, a stranger to the premises, knew there was a pay telephone used by the public or patrons of the dramshop or knew of the use of the passage-way to the toilet, the lunch room or barber shop or saw the detached telephone by the wall or in the chair. To raise this trapdoor one had to go around the west end of the counter, behind it, and to the east end of the trapdoor. When the trapdoor was up, the hole in the floor, as said, took up the entire space for several feet between the counter and the wall fixture, so that no one could come from or go behind the counter without putting the door down, and when anyone came up from the basement, opening the trapdoor to go out, he would find himself behind the counter shut in by the hole and would have to put the door down as part of the floor before he could get out into the lobby of the barroom and go his way. So when the trapdoor was up there was an opening of 20 inches in the passage-way. Some of plaintiff's evidence is to the effect that plaintiff was already in the barroom when the gas inspector

came in, opened the trapdoor and went into the base-
ment, shutting the door after him. Other evidence of
his is to the effect that the inspector was in the base-
ment when plaintiff entered the dramshop. Be that
one way or the other, it was in the middle of the after-
noon. The barroom was flooded by the full light of a
summer's day and there was nothing to hinder any-
one seeing all there was to see. Two friends of plain-
tiff were in the barroom. It seems all three went in
together. Plaintiff was a patron of the place now and
then, but whether he loitered at the counter in this in-
stance is not clear. He had used the phone once before
that day and this time came in to telephone for one of
his said friends about a school entertainment. Pres-
ently, he went to the west end of the counter to said
chair and either found the telephone board in the chair
or took it from the floor and set it in the chair. The
back of the chair was towards the west wall and the
front of the chair was to the east, its front legs about
a foot from the trapdoor. He straddled the chair, fac-
ing the west, his back to the east, and in that position
telephoned. If Burke came into the saloon after plain-
tiff, and went down the trapdoor, plaintiff did not see
him do it. All sides agree that plaintiff was not tele-
phoning when Burke opened the trapdoor to go into
the basement and that he was telephoning while Burke
was down there. All sides agree that Burke did not
know that plaintiff was astraddle the chair telephon-
ing, while the former was in the basement, nor did
plaintiff know Burke was below, nor did he know of
the existence of the trapdoor. These two men finished
their business at about the same time. Burke came up
the stairway from the basement, facing the east, with
his back to plaintiff, and plaintiff sat or stood with his
back to Burke. It seems Burke had put his electric
searchlight in his pocket, and as he came to the head of
the stairway was engaged in putting his memorandum
book in his pocket. The book was of some size and

232 Sup.—39

he was for the instant engaged in fumbling for his pocket with one hand. He had one hand on the trapdoor or towards the door as it rested back against the counter, and plaintiff, at about that time unfortunately, arose from his chair, took a step or moved a few inches backward and fell prone into the deepest part of the hole. The thing happened "quickly." One witness risked the opinion that the door was open a "minute" or "three-fourths of a minute." Another would not put an estimate on it, but the only substantive evidence worth while is to the effect that it happened so quickly that the onlookers, plaintiff's friends, had no time to realize the danger, collect their thoughts and cry out a warning in time to save him. In fact, the noise of plaintiff's fall seems to have been the first thing to attract the attention of his friends, who were standing, one of them at least, close to plaintiff at the west end of the counter. The friend standing there (Bryant) was interested in the telephone message—in fact, plaintiff was telephoning for him and at his instance. There is testimony that the barkeeper had just passed over the place where the door was, returning from the icebox. There is testimony indicating that when the witnesses fixed their minds on the relative positions of the parties, plaintiff was falling and Burke was out and had turned or was turning from facing the east to facing the west. Plaintiff did not turn his head in the direction of the hole before he went backward into it. Burke says he was just turning around when plaintiff fell and saw him for the first time as he was falling. As we read the evidence neither of plaintiff's friends saw the direction Burke was looking right before plaintiff fell. As said, the noise of his fall excited their attention and when they then looked at Burke (taking the whole situation in by a swift glance) they saw him facing west toward plaintiff. They all agree he was bound to face east when he came to the top of the stairs and, in order to face west, as he was facing

when their attention was drawn to him, he must have taken time to turn around after reaching the floor of the barroom. The case proceeds on the self-evident theory that the trapdoor would have to be opened at first partly and then fully as Burke progressed step by step up the basement stairway. It proceeds further on the theory that plaintiff's shoulder was dislocated and his arm paralyzed by his fall. The testimony so shows.

The first question is: On such record, did plaintiff make a case to go to the jury? In other words, will we reverse and remand for another trial, because the court misdirected the jury when plaintiff is not entitled to recover at all?

(a). In reversing judgments and remanding cases for another trial a court of errors moves strictly in a statutory orbit. As an appeal is a mere creature of the statute, the disposition of an appeal in an upper court is subject to statutory regulation. What the statute grants, it may regulate, modify or take away. By express mandate of the lawgiver we are forbidden to reverse any judgment, unless we believe error was committed materially affecting the merits of the action. [Sec. 2082, R. S. 1909.] Attending to that statute and applying the touchstone of proper interpretation (*i. e.,* keeping in view the old law, the mischief and the remedy), it is apparent that its force is spent in so reforming judicial procedure that a judgment may not be reversed for error creeping into the trial below, which did not produce an evil result, or touch a vital spot, *viz.,* the merits of the action. Under that statute the proposition that all error is *presumed* to be injurious is no longer to be applied rigidly in all cases as a live legal precept. Now, what are the *merits* of a cause of action when plaintiff on the record has no cause of action at all? Plainly, the merits in *that* case relate solely to the judgment itself. If, in the case put, the verdict and judgment be right, error antecedent thereto is healed by virtue of the right result attained, the

error becomes harmless, immaterial, non-reversible. Such has come to be the accepted doctrine in establishing a working theory for the administration of the foregoing rule of written law; for, speaking with precision, the law is not an exact, but a practical, applied science, and looks to practical results in dispensing justice. Accordingly, if a court below, giving a wrong reason, reaches the right conclusion, its conclusion will not be disturbed above. So, if a jury could find but one verdict on the facts and finds that verdict, a misdirection by the court does not touch the "merits" of that case. Under the statute in hand, if the court told the jury to go south and they went north and north was the only road the law would allow them to go, we cannot reverse and remand in order that the court might tell them on a new trial to go north. So, if the court give too little, too much, or bad law for a party litigant, and yet the jury *stumble* into a verdict consonant with justice, and the only one the facts allow, under the statute in hand, we must let that judgment alone; for, as said, it is trite doctrine that bad instructions will not explode a verdict and judgment on appeal when the verdict found and the judgment rendered are the only ones the law tolerates. [Mockowik v. Railroad, 196 Mo. l. c. 568, and many cases cited; Moore v. Railroad, 176 Mo. l. c. 545, and many cases cited.] Therefore, before considering the instruction complained of, we may pass, or we do, to the question whether plaintiff made a case.

(b). We think there is no liability. The case is bottomed on the negligence of defendant's servant while about his master's business and acting in the line of his duty. If there was no negligence, there can be no recovery, and we see none as a matter of law. Both Schuepbach and Burke were where they had a right lawfully to be. They were both invitees and neither owed the duty of a proprietor of the premises to the other. [Reynolds v. Van Beuren, 155 N. Y. l. c.

128.]   Neither of them was to blame for the ·existence of an unguarded trapdoor in a used passage-way in a room to which the public were invited.   The blame for that dangerous contrivance must rest elsewhere.   If Burke did not know that Schuepbach, astride the chair, was telephoning so close to the trapdoor that a slight voluntary or involuntary movement would precipitate him in a pit newly opened, no more did Schuepbach know of the trapdoor and that Burke was below and likely to make a pit for him to fall in at the moment of his exit from the basement.   The blame for permitting this unhappy assembly of things, persons and probable results must rest elsewhere.   If it be taken that Schuepbach was without blame in sitting with his back to the trapdoor when using the telephone, by the same token Burke was without blame in opening the trapdoor and coming up the stairway with his back to Schuepbach; for that was the natural and ordinary way to come from the basement.   They were back to back through no fault of either.   Neither of them expected or looked for the other at the instant.   Therefore, if one was in fault in that regard so was the other.   So, they stand in equal fault, if fault it was, in not looking backward to spy out danger.   In coming from the basement evidently there would be a time when the trapdoor, at first partly open, would eventually be and remain for a little while wide open while Burke was yet coming up the stairway, and while he was turning around.   The blame for that condition of things could not rest on Burke while using the trapdoor by permission of the proprietor and in the usual way.   The case then narrows itself so that it hangs, if at all, on a single and slight thread, viz., was Burke guilty of negligence *after* he reached the floor in allowing the trapdoor to remain open an unnecessary length of time. And in answering that question it may be assumed that it was his duty to use due care to close the trapdoor within a reasonable time, having

regard to the circumstances of the case, the danger of injury to persons in the room. He was his brother's keeper to that extent. It may be assumed, also, that if average fair-minded men could fairly entertain two views of whether Burke used ordinary care at the time, the issue of negligence was for the jury.

Barring those *non-compos* and those under disability of infancy, given an adult, as here, then the law holds such adult to the standard of care of an ordinary prudent person, according to circumstance.

Mr. Justice Holmes (Common Law, p. 108), speaking to the matter, says, "If a man is born hasty and awkward, is always having accidents and hurting himself or his neighbors, no doubt his congenital defects will be allowed for in the courts of Heaven, but his slips are no less troublesome to his neighbors than if they sprang from guilty neglect. His neighbors accordingly require him, at his proper peril, to come up to their standard, and the courts which they established decline to take his personal equation into account."

Judging the actions of Burke, then, from the standpoint of an ordinary prudent person, we cannot see, as a matter of law, that there could be any dispute among fair-minded, average men over his lack of negligence. He did not leave the trapdoor and go away. Nor did he dawdle and trifle. He had not stood there absorbed in mental abstraction. He was attending straightway to his immediate business, putting his book in his pocket and turning around to put down the trapdoor and walk over it to the lobby to leave the place. His culpability must not be adjudged by what transpired in a second or two—an instant. The average man does not ordinarily act instantaneously. He must have time to see, to think, to comprehend and act. If those present in the room, and particularly the personal friend of plaintiff, who was watching him

while telephoning, did not see and apprehend his predicament in time to gather their thoughts and even instinctively utter an exclamation of warning, it would be hard lines to hold Burke to a greater standard of diligence. If Burke did not act amiss, then his master stands acquit. The first glance he got of Schuepbach, he was falling and that is about the first glance anyone got of him after the pit yawned. The thing that happened, therefore, being (as between plaintiff and defendant, a mishap and an untoward event neither designed nor to be expected, had in it the fortuitous element of an accident, as that word is technically defined in the law.

(c). The instruction complained of confined the duty of Burke to diligence after he had actual knowledge of the danger to plaintiff. After other narrations, it says: ''And you are instructed that if defendant's servant went on the premises in question solely in connection with his business as a gas meter inspector, and that he used the usual means of ingress and egress open to him for the purposes of his said business, *and had no actual knowledge of the danger to plaintiff in time to have prevented the injury to him by the exercise of ordinary care,* then your verdict should be for defendant.'' The vice of the instruction is said to consist in the limitation aforesaid, in that the duty of Burke was to use ordinary care to look about and see plaintiff as well as ordinary care after he was seen to prevent his injury. In a proper case the criticism of learned counsel for plaintiff would be just, but in this case the abstract rule of law invoked has no application. In the first place, liability could not be predicated from failure to look out for plaintiff, because there is no evidence of any lack of ordinary care in that regard. Again, as said in paragraph '' (b),'' there was no evidence of any negligence; therefore, there could be no recovery.

The judgment is right. Let it be affirmed. It is so ordered. All concur, except *Valliant, J.,* who is absent.